(No. 86-CC-0338—)

JAMES DAVIS, Claimant, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed May 26, 1987.*

JAMES DAVIS, *pro se*, for Claimant.

NEIL F. HARTIGAN, Attorney General (JIM MAJORS, Assistant Attorney General, of counsel), for Respondent.

MONTANA, C.J.

Claimant's complaint arose from an incident on June 2, 1985. On that date, the State of Illinois

Department of Corrections (State) allegedly made Claimant use an unsafe bucket, without a handle, to pour hot water into a coffee pot. The bucket slipped out of his hands, the hot water spilled and caused burns to Claimant's right foot. He further alleged that the State failed to provide proper medical care for his injuries. During the period in question, Claimant was an inmate at Stateville Prison in Pontiac.

The case proceeded to trial on July 10, 1986. The evidence consisted of Claimant's testimony, the Department of Corrections report and Claimant's medical records. Claimant and Respondent each filed briefs in support of their respective positions. Claimant advised the Court on February 22, 1987, that he would not file a reply brief.

For the following reasons, this claim is denied.

At the time of the incident in question, Claimant was assigned to the officers' kitchen at Stateville. His responsibilities were to maintain a steam table and make coffee. Claimant had been assigned to this area for approximately three years. For two of those years he made coffee each morning he worked.

Prior to being assigned to Stateville he had organized kitchens and taught people how to run kitchens. He also trained other prisoners assigned to the officers' kitchen.

Claimant testified that on Sunday, June 2, 1985, at about 5:30 a.m., he was in the kitchen making coffee. He followed the same process he had in the past. Claimant drew hot water for the coffee machine into a bucket. Whether the bucket had a handle or not is disputed. Claimant alleges it was without a handle. He then stood on a chair and proceeded to pour the hot water into the

coffee machine. While Claimant was pouring, the bucket slipped and the water spilled on his foot. He immediately took off his shoe and sock and the skin had begun to blister.

From the kitchen, Claimant went to the office of the kitchen and saw a supervisor named Jones. Jones gave him some Silvadene burn cream, which Claimant applied to his foot. At Jones' direction, Claimant was assisted to the prison hospital.

Upon arrival at the hospital, two paramedics on duty informed Claimant that a doctor was not on duty at the time and that nothing could be done. He asked the paramedics for something for the pain but was refused because no doctor was present. Claimant was told by the paramedics that a doctor would be in between 10 and 10:30 a.m. While he was waiting, the only thing that could be done was to soak his foot in cold water.

Some of Claimant's fellow inmates assisted him into a bathroom. He put his foot in a pan of ice water while he was waiting. During this period Claimant's foot swelled and he passed out intermittently.

At 10:30 a.m. Claimant saw a doctor. The doctor said that it was a second degree burn. The doctor advised a two-day lay in and Tylenol for the pain. A lay in means that Claimant was to stay in his cell with no work activity. When asked about the pain, the doctor responded that Tylenol was all he would prescribe at that time.

The next day, on June 3, a paramedic took Claimant back to the hospital. Blisters on his foot were broken by hospital personnel, medicated and dressed. At this time medication was prescribed for Claimant's pain. The next few days, he had the dressing changed twice a day.

Claimant further testified that on Friday, June 7, he was admitted into the hospital because his foot was infected. Claimant's dressings were still changed twice a day and he was given pain medication twice a day. Approximately one week later, Claimant was discharged from the hospital. Subsequent to discharge he was to return from the cellhouse daily to have the dressings changed and receive therapy. Claimant was told he could return to work when he could get his shoe on. One or two weeks later, he could wear a shoe and was told to return to work.

The Department of Corrections report, offered as evidence by the State, contained an incident report filed by supervisor Jones, a statement by James Heaton, health care unit administrator, and Claimant's medical records. The records indicate that Claimant was treated June 2, at 6:05 a.m., in the prison medical unit by a registered nurse. Silvadene cream and a sterile dressing were applied. No blistering was noted by the nurse and Claimant was told to return at 10 a.m. for examination by a doctor.

Upon return at 10 a.m. the doctor diagnosed "developing first degree burns." The doctor also indicated that the patient did not complain of any pain or discomfort.

On June 3, Claimant returned and was again seen by a nurse and doctor. The diagnosis was changed to second degree burns as blisters had developed. The blisters were debrided and fresh dressings applied. No complaint of pain by the Claimant was indicated. Claimant continued to return for a change of dressings and examination daily from June 3 through June 7.

No complaint of pain was recorded until June 6. Heaton's report states that at 10:20 a.m. on June 6,

Claimant was given two Percodon pain tablets. On June 7, Claimant was admitted to the infirmary for one week for treatment. During that period, any complaints of pain were duly noted and medicated and Claimant's condition was regularly monitored. Claimant was discharged on June 13, with orders to return daily for seven days for therapy and dressing change.

As can be seen from the preceding scenario, the two versions of Claimant's medical treatment parallel each other quite closely. Stripped of Claimant's rhetorical embellishments, the only material deviation stems from when Claimant first complained of pain and whether the State's asserted ignorance of those complaints equals improper medical treatment. The answer to that question has to be no.

The issues before the Court are whether the State was negligent in supplying unsafe equipment for the Claimant and if the medical treatment afforded Claimant was of a standard of care below that required in the community.

The State has a duty to supervise the work of inmates in State penitentiaries and to provide safe and adequate work tools. (*Hughes v. State* (1984), 37 Ill. Ct. Cl. 251.) While it is disturbing that the issue of whether or not the bucket had a handle cannot be definitively resolved because the bucket has mysteriously disappeared, that fact bears little weight upon the Court's conclusion. Accepting as true the assertion that it did not have a handle, Claimant made coffee with this bucket daily for two years. He was familiar with the kitchen operation. It would appear that the Claimant did not act with due care for his own safety in an area and with equipment with which he was familiar.

Granted, as an inmate, Claimant is required to take orders and carry them out. He did not enjoy the same independence as a person outside the penitentiary. To refuse to use the bucket may subject him to disciplinary action. So Claimant kept silent and did as he was told. *Goodrich v. State* (1984), 36 Ill. Ct. Cl. 326; *Moore v. State* (1951), 21 Ill. Ct. Cl. 282.

However, Claimant's position does not relieve him of a duty to exercise due care for his own safety. Claimant has the burden of proving his claim by a preponderance of the evidence and has not done so. *Brown v. State* (1980), 33 Ill. Ct. Cl. 100; *Cook v. State* (1973), 28 Ill. Ct. Cl. 240.

There was no evidence that a supervisor was aware of any dangerous condition or that Claimant ever affirmatively requested a different bucket. (*Burns v. State* (1982), 35 Ill. Ct. Cl. 782.) There was no evidence that Claimant or anyone else had any problems with the bucket before the injury. There was no testimony that the bucket was improper for its use. (*Robinson v. State* (1984), 36 Ill. Ct. Cl. 298.) Further, under the evidence before the Court, the bucket could not be called inherently dangerous. *McCahee v. State* (1977), 33 Ill. Ct. Cl. 326.

Finally, Claimant has failed to show what standards were acceptable and what equipment was proper for use in performing his duties at the time of injury. (*Kemper v. State* (1982), 35 Ill. Ct. Cl. 144.) In fact, Claimant used this bucket and followed the same procedure daily for two years prior to his accident.

Claimant cites *Spears v. State* (1984), 37 Ill. Ct. Cl. 164, as support for his position. *Spears* is inapposite to the facts at hand. In *Spears*, liability was predicated

upon the Claimant's lack of training. Clearly, that situation does not apply to the case at bar.

Claimant's allegations of improper medical care are equally without merit. No proof of the State's alleged negligence other than Claimant's own conclusory testimony was presented. There also was no proof of any standard of care violated by Respondent. *Wollard v. State* (1980), 34 Ill. Ct. Cl. 198.

Claimant must establish a breach of duty through expert testimony to establish that the Respondent deviated from the required standard of care. (See *Conrad v. Christ Hospital* (1975), 77 Ill. App. 3d 337, 395 N.E.2d 201.) Claimant cites *Clark v. State* (1984), 37 Ill. Ct. Cl. 231, in support of his position that he is excepted from the above expert rule.

Claimant's stance is untenable. The negligence in *Clark* was so obvious that an expert was not necessary. This is missing in the present case. Claimant was examined and treated on at least a daily basis from the time of his injury until his return to work. He offered no convincing evidence that either his pain or the seriousness of the injury was exacerbated by the State's treatment. Without more from Claimant, the department report rebuts Claimant's conclusions of negligence and is *prima facie* evidence that adequate treatment was given Claimant. *Splain v. State* (1980), 34 Ill. Ct. Cl. 111.

Accordingly, Claimant James Davis' claim is denied.